IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| LA TOYA HUGHES,<br>    Plaintiff,<br><br>v.<br><br>WHATABURGER<br>RESTAURANTS, LLC, D/B/A<br>WHATABURGER,<br>    Defendant. | §<br>§<br>§<br>§<br>§<br>§<br>§ | <br><br>CIVIL ACTION NO.<br>4:23-cv-875<br>JURY |

**PLAINTIFF'S ORIGINAL COMPLAINT AND JURY DEMAND**

TO THE HONORABLE DISTRICT COURT JUDGE:

Plaintiff La Toya Hughes sues Defendant Whataburger for associational disability discrimination in violation of the Americans with Disabilities Act, as amended, as well as for retaliation for requesting and taking protected leave under the Family and Medical Leave Act, and interference in that protected leave.

Ms. Hughes is a single mother. In July 2021, her daughter was diagnosed with autism. Ms. Hughes, an Operating Partner, transferred stores in order to have a shorter commute to better care for her daughter. Then, in May 2022, Ms. Hughes took continuous FMLA to arrange for therapy and treatment for her daughter.

Everything changed when she returned to work in June 2022. Bizarrely, her supervisor initially refused to let her return to work without a medical release *for herself*, despite knowing the FMLA leave was for her daughter. After Ms. Hughes also started to use intermittent FMLA leave for her daughter, things got even worse. HR began pressuring her to step down from her role

because she was putting her daughter's care above her job.  One HR employee openly told her "When you have your daughter, you can't work. That's the issue."  Ms. Hughes refused because she is fully capable of looking after her daughter and doing her job through the use of FMLA leave, but given that reaction it was clear the company was looking to push her out.

She retained counsel, who notified the company of her legal claims at the end of July 2022.  In response, the company's representative assured her counsel in no uncertain terms that the company felt her performance was good and wanted to keep her.  Yet shortly after that, Ms. Hughes managers wrote her up for violating a nonexistent policy, then put her on a PIP for things out of her control.  More alarmingly, Whataburger also wrote Ms. Hughes up for "unexcused" absences, when in reality those very absences were her use of intermittent FMLA leave.

Less than three months after Whataburger learned Ms. Hughes had retained counsel, it fired her.  Its explanations for the termination are inconsistent, not to mention factually incorrect, and are mere pretext.  In reality, Whataburger fired Ms. Hughes because of her FMLA leave and because of her association with her disabled daughter.

## I.   PARTIES, JURISDICTION, AND VENUE

1. Plaintiff La Toya Hughes is an individual who resides in Tarrant County, Texas.

2. Defendant, Whataburger, is a Texas company with its principal place of business in Texas. Defendant may be served through its registered agent for service of process in Texas, Corporation Service Company, d/b/a CSC – Lawyers Inc. at 211 E. 7th St., Ste. 620 Austin, TX 78701.

3. Personal jurisdiction over Defendant is appropriate because at all times relevant to Plaintiff's claims it operated in the state of Texas, and all of the events giving rise to this lawsuit occurred in Tarrant County in the state of Texas.  Further, an exercise of jurisdiction

|     |     |
| --- | --- |
|     | will not offend traditional notions of fair play and substantial justice. |
| 4.  | Defendant is an employer within the meaning of the Americans with Disabilities Act, as amended, and the Family and Medical Leave Act. |
| 5.  | This Court has jurisdiction to hear the merits of the claims under 28 U.S.C. § 1331 for Plaintiff's claims under federal law. |
| 6.  | Venue is proper in the district and division under 28 U.S.C. § 1391(b). |

## II. FACTUAL BACKGROUND

|     |     |
| --- | --- |
| 7.  | La Toya Hughes first began working for Whataburger in or around April 23, 2018, as a manager. |
| 8.  | By June 2021, Ms. Hughes had been promoted to Operating Partner for her store. |
| 9.  | Ms. Hughes had anticipated working for Whataburger for the rest of her career and always gave her best efforts to the company. |
| 10. | In July 2021, Ms. Hughes' 3-year-old daughter was diagnosed with several disabilities, including autism and development delays. |
| 11. | Ms. Hughes is a single mother. |
| 12. | Ms. Hughes informed Whataburger of these diagnoses immediately. |
| 13. | Following her daughter's diagnoses, Ms. Hughes transferred from a store in Lancaster, TX to an Arlington, TX store to have a shorter commute. |
| 14. | By December 2021, Ms. Hughes transferred to a store in Fort Worth to have a shorter commute. |

15. At that store, Ms. Hughes' supervisors were Area Coach Preston Hughes (no relation)[1], Area Coach Mark Shields, and George "Adam" Schumaker, who was in training to replace Mr. Shields.

16. On or about May 5, 2022, Ms. Hughes requested and received continuous FMLA leave for 30 days to arrange for therapy and treatment for her daughter.

17. Following the start of this continuous FMLA leave, Ms. Hughes also requested intermittent FMLA leave to care for her daughter beginning after she returned from the continuous leave.

18. That intermittent leave was approved as well, to cover the remaining weeks left in Ms. Hughes' FMLA leave this year and then on to June 2023.

19. But when Ms. Hughes returned to work on or about June 4, 2022, the attitude of her supervisors and HR had changed dramatically.

20. When Ms. Hughes first accessed the store email, she saw that manager Sherrice Boykin had been placed in her position as Operating Partner, and various other employees told Ms. Hughes they had believed Ms. Boykin had replaced her.

21. Typically when Operating Partners go on leave, Whataburger does not replace them even temporarily.

22. In addition, when Ms. Hughes returned Mr. Shields demanded that she get a full medical release for *herself* to return to work without restrictions, even though he was fully aware Ms. Hughes took the leave to care for her daughter and not because of her own medical condition.

---

[1] In the interest of avoiding confusion, hereafter Preston Hughes will be referred to using his full name.

23. Mr. Shields insisted Ms. Hughes leave the store and to not return to work from FMLA leave until she got that personal medical release without any restrictions.

24. On or about June 5, 2022, Ms. Hughes called Whataburger's leave management hotline about Mr. Shield's demand that she had to get a full release.

25. The representative, Tammy Mikesell, said that Mr. Shields should not have made her leave the store.

26. Ultimately, Ms. Hughes was only allowed to return to work the following week, on or about June 14, 2022.

27. After that, Ms. Hughes had several discussions with Market Leader Melika Madison and HR employee Kishina Thomas.

28. They emphasized that Ms. Hughes needed to be available 24/7, and twice pressured her to step down from her role and accept a demotion to manager because of her daughter.

29. At one point, they told Ms. Hughes she should step down until her daughter starts school.

30. However, Ms. Hughes' daughter had been going to school since January 2022, as Mr. Shields and Preston Hughes were well aware.

31. **Indeed, Ms. Thomas outright told Ms. Hughes that "When you have your daughter, you can't work. That's the issue."**

32. Through those sorts of statements, the company made it clear that it considered Ms. Hughes' need to care for her disabled daughter to be an obstacle to her work.

33. Tellingly, in a later EEOC position statement Whataburger only included a statement from Ms. Madison regarding that meeting, and not Ms. Thomas, to hide the fact that Ms. Thomas had explicitly claimed Ms. Hughes' daughter affected her ability to work.

34. In reality, Ms. Hughes *is* able to work even when she has her daughter, and there is in fact no requirement for Operating Partners to be available 24/7.

35. As a result, Ms. Hughes retained counsel in July 2022, and said counsel sent Whataburger a letter asserting claims under the ADA, FMLA, and Texas Labor Code.

36. The company received that letter on July 28, 2022.

37. Thereafter, the company's representative, Ron Campos, explicitly assured Ms. Hughes' counsel that the company saw Ms. Hughes as a good employee and that they wanted to keep her and not replace her.

38. However, after Ms. Hughes retained counsel, the company abruptly began to insist she count any time she used to pick up her daughter from school against her FMLA leave.

39. Further, on or about September 2, 2022, for the first time Preston Hughes wrote Ms. Hughes up for firing an employee for theft, claiming that there was a policy that she had to run such a decision past HR first.

40. However, Ms. Hughes had never previously been told to contact HR before firing other employees for theft in the past, and no such policy exists in the employee handbook.

41. Preston Hughes refused to give Ms. Hughes a copy of the write up or the supposed policy she violated, despite her requests.

42. When Ms. Hughes finally received a copy of that write-up with Whataburger's position statement, it still included no reference to what specific policy she supposedly violated.

43. Then, on September 13, 2022, Preston Hughes gave Ms. Hughes a final written warning because her store was supposedly not meeting various goals.

44. Preston Hughes also gave Ms. Hughes a "30/60/90" Performance Coaching Document requiring Ms. Hughes to meet various goals at 30, 60, and 90 days.

45. The goals were unrealistic and required Ms. Hughes to control things outside of her control, such as forcing employees to come in or controlling everything her managers did.

46. *The very next day*, September 14, Preston Hughes wrote Ms. Hughes up for supposedly missing work 10 hours a week as unapproved absences, as a supposed addendum to the write-up the day before.

47. These supposed missing hours were in reality the times when Ms. Hughes left to pick up her daughter from school, which the company had previously claimed were covered by the FMLA.

48. In other words, the write up was for using FMLA leave.

49. Perhaps recognizing how blatantly illegal such a write-up was, Whataburger's position statement to the EEOC makes no mention of it whatsoever, instead pretending it does not exist.

50. Ms. Hughes had been taking time off to pick up her daughter from school since January 2022 by this point without any complaints—until she hired counsel.

51. The same week of these write ups, Whataburger's leave management began suddenly asking Ms. Hughes for more information from her daughter's doctor concerning her need for FMLA leave, even though the company had already approved that leave.

52. This violated the company's FMLA policy, which provides that Whataburger can request recertification "only when circumstances have changed significantly, or if Whataburger receives information casting doubt on the reason given for the absence." Neither condition had been met here.

53. Then, Ms. Madison told Ms. Hughes that she was no longer allowed to pick her daughter up from school without prior approval from Preston Hughes.

54. Following that, Ms. Madison and Preston Hughes questioned several of Ms. Hughes employees to inquire if she was treating them "fairly," in an obvious attempt to get someone to complain about Ms. Hughes.

55. Later in September, team leader Brandon Potter told Ms. Hughes that Preston Hughes had a discussion with one Ms. Hughes managers, Christina Killgore, about making "changes" in Ms. Hughes store within the next 30 days.

56. In addition, starting in September, whenever Ms. Hughes left the store Preston Hughes and Mr. Schumaker would approach Ms. Hughes' employees and ask them to call HR to complain about her.

57. The week of September 19, 2022, Preston Hughes told Ms. Hughes that he now expected her to work 6 days a week instead of 5 days.

58. Whataburger was clearly trying to force Ms. Hughes to quit, or to create a pretext to fire me.

59. So, Ms. Hughes filed a Charge of Discrimination, No. 450-2023-00410, on October 14, 2022.

60. On or about October 17, 2022, Ms. Hughes discovered she had been removed from the schedule.

61. During a phone call on October 18, 2022, with Preston Hughes, Ms. Madison, and Ms. Thomas, Preston Hughes "offered" Ms. Hughes a demotion to manager.

62. As that was the very same role the company had been trying to get Ms. Hughes to step down to because of her daughter since June, Ms. Hughes declined again.

63. At that point, Ms. Hughes specifically said she thought this action was because of her daughter, and at that time Preston Hughes claimed the demotion was actually about performance.

64. Immediately after Ms. Hughes declined, she was fired during the same call.

65. Ms. Hughes was told she had failed the Performance Coaching Document and was being fired for performance and for supposedly letting an unnamed, "unapproved person" behind the front counter on October 4, 2022.

66. In fact, Ms. Thomas had been present and directly observed that person go behind the counter (unlike Ms. Hughes), and had even spoken to him, but did not stop him.

67. Instead, Ms. Hughes had been the one to call the police on that person to have them removed.

68. When Ms. Hughes asked about that incident and pointed out the above, Preston Hughes refused to discuss it.

69. This termination phone call was the first time Ms. Hughes had ever been told there were any any concerns about my behavior that particular incident from weeks before.

70. Ms. Hughes was also told she had supposedly violated the (non-existent) policy from the September 2 write-up *again*, without any details.

71. Ms. Hughes later asked Preston Hughes for something in writing about this termination because it seemed clear he was reading off a script during the call, but was never given anything.

72. When Ms. Hughes did finally receive a copy of the termination document as an exhibit to Whataburger's position statement to the EEOC, it contained zero mention whatsoever of

this alleged October 4, 2022, incident, despite Preston Hughes going into detail about it during the call.

73. Ms. Hughes filed a supplemental charge of discrimination regarding her termination on November 2, 2022. This was numbered Charge No. 450-2023-1009.

74. After Ms. Hughes filed that supplemental charge, in a position statement Whataburger claimed that "Ms. Hughes chose to end her employment with Whataburger," which is blatantly false.

75. Ms. Hughes had requested and received the right to sue from the EEOC concerning her associational disability claim, and all conditions precedent to filing suit have been satisfied for fulfilled.

### III.    DISCRIMINATION IN VIOLATION OF THE ADAAA

76. Ms. Hughes re-alleges and incorporates the allegations contained in the above paragraphs as if fully stated herein.

77. Plaintiff is associated with someone (her daughter) with disabilities within the meaning of the ADAAA.

78. Plaintiff was qualified for her position at all relevant times.

79. Defendant's actions, including Ms. Hughes's discharge, were undertaken because of her association with her disabled daughter. These actions constitute violations of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12111, *et seq.*, as amended ("ADAAA").

80. The employment practices complained of above were intentional.

81. As a result of Defendant's unlawful discrimination, Ms. Hughes has suffered and expects to suffer pecuniary losses, including but not limited to lost wages and other benefits

associated with her employment.

82. As a result of Defendant's discrimination, Ms. Hughes has suffered non-pecuniary losses including, but not limited to, emotional pain, suffering, inconvenience, personal humiliation, mental anguish, loss of enjoyment of life, and other non-pecuniary damages.

83. To redress the injuries sustained by Ms. Hughes on account of Defendant's discriminatory actions, she has retained the undersigned counsel to represent him in this action. She therefore seeks recovery of reasonable attorneys' fees, experts' fees, and costs.

84. At all times Defendant acted willfully, maliciously, and with conscious disregard to Plaintiff's federally protected rights, entitling her to punitive damages.

85. Additionally, Ms. Hughes seeks any and all equitable relief necessary to return her to the position that he would have been in but for Defendant's unlawful discrimination.

## IV.   RETALIATION IN VIOLATION OF THE FMLA

86. Ms. Hughes re-alleges and incorporates the allegations contained in the above paragraphs as if fully stated herein.

87. Ms. Hughes requested and took protected leave under the Family and Medical Leave Act.

88. Defendant subjected Ms. Hughes to adverse employment actions because of her engagement in protected activities, including firing her.

89. Defendant's actions constitute unlawful retaliation on the basis of Ms. Hughes's protected activity of requesting FMLA leave, in violation of the Family and Medical Leave Act, 29 U.S.C. § 2601, *et seq*.

90. The employment practices complained of above were intentional and willful.

91. As a result of Defendant's unlawful retaliation, Ms. Hughes has suffered and expects to suffer pecuniary losses, including but not limited to lost wages and other benefits

associated with her employment.

92. To redress the injuries sustained by Ms. Hughes on account of Defendant's retaliatory actions, she has retained the undersigned counsel to represent him in this action. Shee therefore seeks recovery of reasonable attorneys' fees, experts' fees, and costs.

93. Additionally, Ms. Hughes seeks any and all equitable relief necessary to return her to the position that she would have been in but for Defendant's unlawful retaliation.

## V.   INTERFERENCE IN FMLA RIGHTS

94. Ms. Hughes re-alleges and incorporates the allegations contained in the above paragraphs as if fully stated herein.

95. At all relevant times, Ms. Hughes was an eligible employee as defined by the Family and Medical Leave Act, 29 U.S.C. § 2601, *et seq*.

96. At all relevant times, Defendant was an employer subject to the FMLA.

97. Defendant's actions as described above constitute unlawful denial of and/or interference with Ms. Hughes's exercise of her rights under the FMLA, in violation of 29 U.S.C. § 2615.

98. As a result of the unlawful actions of Defendant as described above, Ms. Hughes has suffered, and will continue to suffer, actual damages.

99. To redress the injuries sustained by Ms. Hughes on account of Defendant's actions, she has retained the undersigned counsel to represent her in this action.

100. Ms. Hughes therefore seeks recovery of reasonable attorneys' fees, experts' fees, and costs.

101. Ms. Hughes seeks to recover these pecuniary losses, liquidated damages, and reasonable attorneys' and experts' fees, and costs of suit as provided in 29 U.S.C. § 2617.

## VI. JURY DEMAND

102. Plaintiff hereby makes a demand for a trial by jury on all issues, claims, and defenses in this action.

## VII. PRAYER

103. WHEREFORE, Plaintiff La Toya Hughes respectfully requests that the above-named Defendant be cited to appear in this matter and that, after jury trial by proof, she be awarded:

   A. Back pay, including but not limited to lost wages (including salary and commissions) and other employment benefits;

   B. Reinstatement to Plaintiff's position of employment, equivalent position of employment, or the position of employment Plaintiff would have enjoyed but for the discrimination, retaliation, and other illegal acts;

   C. In the event that reinstatement is not feasible, front pay with respect to all pay and benefits Plaintiff would have received;

   D. Judgment against Defendant for compensatory damages including emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life;

   E. Actual damages;

   F. Punitive Damages;

   G. Liquidated damages;

   H. Judgment against Defendant for Plaintiff's reasonable attorneys' and experts' fees, and costs of suit;

I. Prejudgment and post-judgment interest as allowed by law; and

J. Such other and further legal and/or equitable relief to which Plaintiff may be justly entitled, as this Court may deem proper.

Respectfully submitted,

*/s/ Austin P. Campbell*

Robert J. Wiley
Texas Bar No. 24013750
*Board Certified – Labor and Employment Law – Texas Board of Legal Specialization*

Austin P. Campbell
Texas Bar No. 24103768
*Board Certified – Labor and Employment Law – Texas Board of Legal Specialization*

LAW OFFICE OF ROB WILEY, P.C.
2613 Thomas Avenue
Dallas, Texas 75204
Telephone: (214) 528-6500
Facsimile: (214) 528-6511
acampbell@robwiley.com

ATTORNEYS FOR PLAINTIFF